# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RICHARD DESMOND GLOVER,

        Defendant-Appellant.

UNPUBLISHED
March 31, 2016

No. 321454
Wayne Circuit Court
LC No. 13-010736-FH

Before: RONAYNE KRAUSE, P.J., and GLEICHER and STEPHENS, JJ.

PER CURIAM.

A jury convicted defendant of carrying a concealed weapon, MCL 750.227, felon in possession of a firearm, MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm) – second offense, MCL 750.227b. He raises several challenges to the use of his felon status at trial, the prosecutor's commentary during closing and rebuttal argument, the trial court's conduct of jury voir dire, and the adequacy of his trial counsel's performance. None of his complaints warrant relief, and we affirm defendant's convictions and sentences.

## I. BACKGROUND

At approximately 10:00 p.m. on October 11, 2013, two Detroit police officers responded to a complaint that a green vehicle was parked in a low-income housing neighborhood playing loud music, and that its occupants were selling narcotics. When the officers arrived, they observed a man and woman standing outside the vehicle. The pair appeared nervous and entered a green Ford Explorer parked lengthwise across three parking spots. The officers approached the vehicle, explained the complaint to the occupants, and asked them to exit. As the man disembarked the vehicle, one of the officers noted that the side pocket of his "black puffy vest" seemed weighed down. The officer suspected that the man possessed a handgun and ordered him to place his hands on his head so he could conduct a patdown search. Instead of complying, the man fled on foot through a field. As the officer chased him, the man pulled a handgun from his vest pocket and threw it to the ground. The officer collected the gun, but was unable to catch the suspect.

The woman in the Explorer, Carol Bronner, told the investigating officers that the vehicle belonged to her brother's girlfriend, Casion Fountain. Bronner explained that she lived in the home adjacent to the parking area and that Fountain had left her vehicle parked askew when it stalled earlier that evening. Upon the officers' inquiry, Bronner gave defendant's name.

-1-

Investigation revealed that both the Explorer and the handgun collected at the scene were registered to Fountain. The officers ran a LEIN check[1] of defendant's name, which returned at least two driver's license photographs, and a photograph from the Michigan Offender Tracking Information Service (OTIS), which is managed by the Michigan Department of Corrections (MDOC). From those photographs, the officers identified defendant as the man who fled the scene and disposed of the handgun.

Defendant claimed that this was a case of mistaken identity. Fountain testified that defendant was at her home in Oak Park at the time of the police encounter. Bronner and her sister, Rebecca Glover, who was visiting the residence at the time, testified that defendant was not present and the police took chase after a neighbor who happened to be in the area when the police arrived. The jury rejected this defense and convicted defendant as charged.

## II. STIPULATION TO FELON STATUS

Defendant first contends that this Court should "adopt a new procedure to remove prejudicial information from the jury where a defendant is charged with Felon in Possession of a Firearm." Defendant concedes that criminal defendants currently have the choice to stipulate to their status as a felon to avoid prejudicially detailed information about the nature of their past offenses reaching the jury. The very fact that a defendant is a felon is prejudicial, defendant urges, and therefore the prosecution should be required to allow a defendant the opportunity to plead guilty to the felon-in-possession charge to ensure a fair trial. Defendant further contends that the prosecutor improperly used the fact of his felon status at different points in the trial.

Here, defense counsel stipulated to defendant's felon status at the onset of trial. There is no indication in the record that defendant ever expressed an interest in pleading guilty to the felon-in-possession charge. Accordingly, defendant failed to preserve his challenge, see *People v Mayfield*, 221 Mich App 656, 660; 562 NW2d 272 (1997), and our review is limited to plain error affecting defendant's substantial rights, *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

This Court addressed nearly the same issue in *Mayfield*. In that case, the defendant argued "that the felon-in-possession charge should have been severed from the remaining charges because it was impossible for him to obtain a fair trial where, incident to the felon-in-possession prosecution, the jury was presented with evidence that defendant was already a felon." *Mayfield*, 221 Mich App at 658. This Court adopted the reasoning of *United States v Mebust*, 857 F Supp 609 (ND Ill, 1994), that severance was not required to protect a defendant's right to a fair trial. Instead, "adequate safeguards could be erected" during the trial to limit the danger of unfair prejudice. *Mayfield*, 221 Mich App at 659.

> "Specifically, (1) the fact of defendant's conviction could be introduced by a stipulation, (2) the court can give limiting instructions emphasizing that the jury must give separate consideration to each count of the indictment, and (3) more

---

[1] LEIN stands for "law enforcement information network."

specifically, the jury could be instructed to only consider the prior conviction as it relates to [the felon-in-possession prosecution]." [*Id.* at 660, quoting *Mebust*, 857 F Supp at 613 (alteration in original).]

This Court upheld the adequacy of the safeguards outlined in *Mayfield* in *People v Green*, 228 Mich App 684, 691-692; 580 NW2d 444 (1998). As severance is not required to protect a defendant's fundamental rights, we discern no ground to require the prosecution to offer a defendant the opportunity to plead guilty to a felon-in-possession charge to avoid prejudice, either.[2]

Moreover, all three recommended safeguards were employed at defendant's trial. Defendant stipulated to his felon status, without mentioning the specific nature of his prior offense. The trial court provided a limiting instruction emphasizing that the jury must give separate consideration to each count of the information. Specifically, the trial court instructed the jury that it must "consider each crime separately in light of all the evidence" and provided a separate instruction for the three charges, clearly identifying the distinct elements of each. The trial court also expressly instructed the jury not to "use [defendant's prior conviction] for any other purpose," i.e., other than considering the felon-in-possession charge.

Defendant also claims prejudice based on the improper use of his felon status throughout the trial. Defendant notes that during the prosecutor's cross-examination of defense witness Fountain, the prosecutor inquired into Fountain's knowledge of her fiancé's felon status. Fountain explained that her handgun was in her vehicle at the time it stalled in front of Bronner's home. Fountain claimed that the clip had been stored in the glove compartment, while the handgun was in a compartment in the trunk area. Fountain further indicated that she locked her vehicle when she left in a cab to find a mechanic to assist her. The prosecutor queried:

> *Q*. You don't want to see [defendant] in trouble today, correct?
>
> *A*. I wouldn't want to see anyone in trouble, no.
>
> *Q*. Okay. Ms. Fountain, you knew your fianc[é] was a convicted felon on the date of this offense, correct?
>
> *A*. Yes.

---

[2] Defendant does not appreciate that had he pleaded guilty to being a felon in possession of a firearm, he necessarily would have established the elements of the other charges he faced: carrying a concealed weapon without a license and carrying a weapon during the commission of a felony (here, being a felon in possession).

Defendant also contends that his counsel was ineffective for stipulating to his felon status instead of pursuing other relief. However, counsel is not ineffective for failing to pursue a novel theory that is inconsistent with Michigan law. See *People v Reed*, 453 Mich 685, 695; 556 NW2d 858 (1996).

*Q*. Are you trained to leave your gun around a convicted felon?

*A*. He knew nothing about that weapon. It's not registered to my apartment, and he wasn't around it.

\* \* \*

*Q*. You . . . said you knew that [defendant] was not allowed to carry a gun because he was a felon. Did you get the gun for him because he was unable to purchase it himself?

*A*. No. . . .

\* \* \*

*Q*. You knew he was a felon, right?

*A*. That's one of the reasons he didn't know [I had a gun], and he would object to it.

*Q*. You knew he was a felon, right?

*A*. Yes.

On cross-examination of defendant's sister, Rebecca Glover, the prosecutor inquired:

*Q*. You know your brother is a convicted felon, right?

*A*. Yes.

*Q*. You don't want to see him in trouble today, right?

*A*. No.

However, defense counsel did not object to the questions posed to his witnesses and those challenges are therefore not preserved. In finding a lack of prejudicial error, we find instructive *People v McDonald*, 303 Mich App 424, 436-437; 844 NW2d 168 (2013):

Defendant next argues that "repeated" references to his parolee status during trial amounted to improper character evidence. With respect to this unpreserved claim of error, defendant simply cannot establish plain error affecting his substantial rights, let alone that he is actually innocent or that any error seriously affected the integrity, public reputation, or fairness of the judicial proceedings independent of his innocence. . . . The jury knew that defendant had a prior felony conviction because he was charged with felon in possession of a firearm and because the parties stipulated that defendant had a prior felony conviction. The danger in revealing a defendant's parolee status is that a jury will recognize that the defendant had previously been convicted of a crime, but that was already known here, so the requisite prejudice allegedly stemming from the

-4-

parole references has not been shown. The trial court also cautioned the jurors not to consider the stipulation and defendant's status as a felon for any purpose other than establishment of the "felon" element for felon in possession. Jurors are presumed to follow a trial court's instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

Just as in *McDonald*, reversal is unwarranted in this case.

Defendant also notes on appeal that the prosecutor returned to his theme of relying on defendant's felon status at several points in closing argument. The prosecutor repeatedly contended in closing and rebuttal argument that defendant fled that night because he was a convicted felon and did not want to be caught in illegal possession of a handgun. The prosecutor further referenced defendant's criminal status when questioning Fountain's veracity:

> Ladies and gentlemen, you heard from the fianc[é] who wants you to believe she's been with [defendant] for over a year. They are engaged, but yet she knows he's a felon, but she wants you to believe she has no idea what his previous convictions were for. . . . [S]he told you she's never seen him with a gun before. Furthermore, she says [defendant] doesn't even know that she carries a gun. She keeps it a secret. Her own fianc[é] doesn't know she carries a gun and he's a felon and she knows he can't be around guns? Do you believe any of that, ladies and gentlemen?

We do not condone the prosecutor's repeated references to defendant's felon status at trial, either during the questioning of the witnesses or during cross-examination. The prosecutor was well aware that the information could only be used in considering the felon-in-possession charge and yet injected the issue to support a theme that defendant's sisters and fiancé were lying to protect him. However, as noted, the information was not overly prejudicial as defendant stipulated to his felon status at trial.

Defendant's appellate counsel highlights the prosecutor's focus on defendant's criminal past during the examination of Detroit Police Officer James Compton. Officer Compton testified that by running a LEIN check of defendant's name, he was able to "pull up" several photographs. These included images from defendant's current and past driver's licenses as well as "a photo from MDOC's web site." The prosecutor then admitted into evidence as People's Exhibit 3 a text message string including the photograph Officer Compton used to identify defendant. At 12:09 a.m. on October 12, a screen shot of a photograph of defendant was sent with the accompanying message, "I pulled up his OTIS."

We take issue with the prosecution's lax efforts to preserve evidence, specifically People's Exhibit 3, which required a remand for a lengthy evidentiary hearing to determine the content of the exhibit. Without waiting for the appeal in this matter to resolve, the prosecution electronically scanned the entirety of its file, including the documentary evidence presented at trial. The prosecution failed to ensure that the contents of the electronic file were legible and adequately preserved for appellate purposes. As a result, this Court was left to review a blurry,

illegible reproduction of People's Exhibit 3. The text message string includes a fuzzy screen shot of writing from a computer screen, a screen shot of a photograph of defendant, and the message, "I pulled up his OTIS." After several days of hearings, it was clear that no one remembered what message was conveyed in the screen shot of writing on the computer screen. The officer who secured the photograph in the text message string testified that it was the image on defendant's driver's license. That officer also recalled that the computer text indicated "no hits," but nothing more. A Wayne County Detective employed by the prosecutor's office testified that he recognized the format of the image as being generated in a LEIN request. In his estimation, the screen did not resemble the format used to convey criminal history information.

The trial court ultimately ruled that the photograph was not a mug shot and the now-illegible written information did not communicate defendant's criminal history. We are inclined to accept this factual assessment. As noted by the circuit court, defense counsel did not seek exclusion of this evidence at trial on the ground presented on appeal and "his silence speaks volumes." Defense counsel did object to the admission of the exhibit, but only on the ground that it mentioned "OTIS." He made no notation in his file and made no comment on the record regarding any concern that the photograph was a mug shot or the computer screen shot contained information about defendant's criminal history. Had the exhibit included such information, we would hold that defendant was entitled to a new trial. As the record created at the lengthy evidentiary hearing supports that this was not the case, we agree that prejudice cannot be established. While the exhibit mentions OTIS, this term was not explained, and it is unlikely the jury of lay persons knew its import. Accordingly, we reject defendant's request for a new trial.

### III. JURY SELECTION

Defendant contends that the trial court deprived him of his right to an impartial jury by refusing to allow counsel to question the potential jurors during voir dire, and by failing to ask sufficient questions for counsel to make informed decisions regarding juror challenges. Defendant failed to preserve these issues by raising a contemporaneous objection and our review is again limited to plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763.

"A defendant who chooses a jury trial has an absolute right to a fair and impartial jury." *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994), citing *Duncan v Louisiana*, 391 US 145; 88 S Ct 1444; 20 L Ed 2d 491 (1968). Voir dire is an integral step in ensuring this right. "The purpose of voir dire is to elicit enough information for development of a rational basis for excluding those who are not impartial from the jury." *Tyburski*, 445 Mich at 618. During voir dire, questions are posed to the potential jurors "in an effort to uncover any bias they may have that could prevent them from fairly deciding the case. It is the only mechanism, and the only safeguard a defendant has, for ensuring the right to an impartial jury." *Id.*

Defendant contends that he had a right to have his attorney question the potential jurors. However,

> the trial court has discretion in both the scope and the conduct of voir dire. *Defendant does not have a right to have counsel conduct the voir dire . . . .* Neither does he have a right in every case to have the court ask questions submitted by counsel. [*Id.* at 618-619 (emphasis added).]

See also *People v Washington*, 468 Mich 667, 674; 664 NW2d 203 (2003).

Defendant also challenges the adequacy of the trial court's voir dire. If the court opts to conduct voir dire without questions from the attorneys, "the court abuses its discretion if it does not adequately question jurors regarding potential bias so that challenges for cause, or even peremptory challenges, can be intelligently exercised." *Tyburski*, 445 Mich at 619. There are no "hard and fast rules" regarding what constitutes acceptable voir dire. *People v Sawyer*, 215 Mich App 183, 186; 545 NW2d 6 (1996) (quotation marks and citation omitted). "Rather, trial courts must be allowed wide discretion in the manner they employ to achieve the goal of an impartial jury." *Id*. at 186-187 (quotation marks and citation omitted). In reviewing the trial court's conduct, the test is whether voir dire was "sufficiently probing . . . to uncover potential juror bias." *Tyburski*, 445 Mich at 609. "It is imperative, in securing the rights of the parties to an impartial jury, for the court to allow the elicitation of enough information so that the court itself can make an independent determination of a juror's ability to be impartial." *Id*. at 620.

During voir dire, the trial court queried whether any of the potential jurors knew defendant, the prosecutor, defense counsel, or any of the witnesses. The court asked the venire if anyone had specific time constraints that prevented them from serving on the current jury. It also inquired into any medical conditions or hearing deficits that would impair jury service and excused two individuals on that ground.

After bringing venire members into the jury box, the court asked each individual to answer nine questions listed on "a laminated yellow sheet of paper": (1) the juror's spouse's name, city of residence, and where the juror and his or her spouse are employed; (2) the highest level of education attained by the juror and his or her spouse; (3) whether the juror had ever served on a jury; (4) whether the juror had ever testified at a trial; (5) whether the juror had ever been a party in a lawsuit; (6) whether the juror had any close connection with law enforcement or attorneys that would affect his or her ability as a juror; (7) whether the juror had ever been arrested, charged, or convicted of a crime; (8) whether the juror had been the victim of a crime; and (9) whether the juror owned a gun. At certain points throughout voir dire, the court asked additional questions to clarify a potential juror's response.

One juror indicated that she had been robbed at gunpoint and that her experience would affect her ability to render a fair and impartial verdict in the case because "she was pretty freaked out over guns." The court excused that juror. Another stated that she had been robbed at gun point while working at a bank. That juror asserted, "I can't say" that the experience would not impact her ability to be fair and impartial because "[i]t was traumatic [and] horrible." The court also excused that individual from jury service. A third venire member offered that she had "been the victim of a crime before at gunpoint, but it doesn't bother me." She continued that she could "put aside that situation where this gun was pointed at [her]." The court did not excuse that potential juror and neither attorney requested her removal. Both the prosecutor and defense counsel exercised peremptory challenges during voir dire, excusing other potential jurors from service. And neither requested at any point to ask any questions to clarify or delve deeper into a venire member's answers.

There was nothing unusual about this case that required different or more probing questions. For example, this case had not been the subject of media coverage requiring questions

about the potential jurors' knowledge of the case. See, e.g., *People v Orlewicz*, 293 Mich App 96, 105; 809 NW2d 194 (2011). The court used the information elicited during voir dire to excuse two jurors and both attorneys exercised peremptory challenges, evidencing that they felt they had sufficient knowledge to independently gage juror partiality. Upon this record, we discern no prejudicial error requiring relief.[3]

## IV. MOTION TO SUPPRESS

Defendant contends that the trial court should have found his detention by police illegal and suppressed the handgun collected on the night in question. Defense counsel filed a pretrial motion to suppress the evidence and the court conducted a hearing before denying defendant's request. We review de novo a trial court's decision following a suppression hearing and its underlying factual findings for clear error. *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005).

Both the United States and Michigan Constitutions protect persons against unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11. A police officer may conduct an investigative, or *Terry*[4] stop, if he "has a reasonable, articulable suspicion that criminal activity is afoot." *People v Steele*, 292 Mich App 308, 314; 806 NW2d 753 (2011). To determine if an officer had reasonable suspicion, the trial court should consider whether "the facts known to the officer at the time of the stop would warrant an officer of reasonable precaution to suspect criminal activity." *Id.* This determination is made case-by-case and under the totality of the circumstances. *Id.* The trial court should give deference to the "experience of law enforcement officers and their assessments of criminal modes and patterns." *Id.* at 315. An officer's subjective intent is irrelevant in determining whether a stop was supported by reasonable, articulable suspicion of unlawful activity. *People v Dillon*, 296 Mich App 506, 509; 822 NW2d 611 (2012). In addition, a search or seizure must be justified at its inception. *Williams*, 472 Mich at 314.

Here, defendant's interaction with the officers did not begin as a search and seizure, or even an investigatory stop under *Terry*. The officers originally approached the Explorer and its occupants seeking voluntary cooperation into a noise and narcotics complaint. The interaction transformed into an investigative stop and took on constitutional implications once the officers ordered defendant to place his hands on his head so they could conduct a patdown search of his person. However, the search and seizure was justified and therefore the evidence collected was not tainted.

---

[3] Defendant again contends that counsel was ineffective for failing "to object to the way in which the voir dire was handled." As defendant had no right to have counsel conduct voir dire and the questions asked by the court were sufficiently probing to allow defense counsel to exercise peremptory challenges, any objection would have been futile. Defendant therefore cannot support his appellate complaint. See *People v Eisen*, 296 Mich App 326, 329; 820 NW2d 229 (2012).

[4] *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

When the officers approached defendant and Bronner, they were investigating a complaint by a local resident that someone in a green vehicle was playing loud music and appeared to be conducting controlled-substance transactions. Defendant and Bronner were loitering near a green vehicle, the only green vehicle parked in the area from which the complaint emanated. Upon the officers' arrival, defendant acted "very nervous"; "his eyes got kind of big, and he was just kind of like briskly walked over and got into the vehicle kind of like he just didn't want to have anything to do with us." Officer Compton approached the passenger side of the vehicle where defendant was sitting and "asked" him to exit the vehicle so the two could talk. As defendant exited the vehicle, he "blad[ed] his body away from" the officer to block the officer's view of his right side. The officer noticed that defendant's right vest pocket "was weighed down and sagging" despite defendant's efforts. Officer Compton testified that in his "experience as a police officer, [he] felt that [defendant] was possibly armed." Given the appearance of defendant's pocket and defendant's evasive conduct, the officer reasonably believed that defendant may have been carrying a firearm. Accordingly, the officer's decision to transform the interaction into an investigative stop was reasonable, as was the search that the officer attempted to conduct. We therefore discern no error in the admission of the handgun tossed by defendant as he fled from police.

## V. PROSECUTORIAL MISCONDUCT

Defendant contends that the prosecutor engaged in misconduct by arguing facts not in evidence and denigrating defense counsel during closing and rebuttal argument. Defendant failed to preserve these challenges by raising contemporaneous objections, *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010), and our review is limited to plain error affecting defendant's substantial rights, *Carines*, 460 Mich at 763.

The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). We review such challenges on a case-by-case basis, examining the entire record and evaluating the prosecutor's remarks in context. *Id.* at 64. We must also review the prosecutor's commentary in light of the defense arguments. *Id.*

A prosecutor may not make a statement of fact to the jury that is unsupported by the evidence, but is "free to argue the evidence and all reasonable inferences from the evidence as it relates to the theory of the case." *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008). During closing argument, the prosecutor stated regarding Bronner: "And instead of chasing this, one of the sisters said [defendant] must have had a twin out there that night, a bald head black male that took off running." Bronner actually testified that a "guy" who "lives in the area, in the community" was standing outside when the police arrived and this was the individual who fled. On cross-examination by the prosecutor, Bronner described that individual as being slightly taller than she with darker skin than hers and sporting a bald head. Defendant is also a dark-skinned, bald man. The prosecutor's comment is a reasonable inference arising from Bronner's testimony that a person coincidentally fitting defendant's description was the person that ran from the police. It was also a reasonable response to the defense theory that someone who looked like defendant happened to have possessed Fountain's handgun on the night in question. Therefore, it was not improper.

Defendant also contends that the prosecutor improperly stated that Fountain "wants you to believe she has no idea what [defendant's] previous convictions were for." This statement is contrary to the evidence presented during trial. When asked by the prosecutor if she knew what defendant had "been previously convicted of," Fountain answered in the affirmative. Although the comment was improper, we discern no prejudicial error requiring relief. The comment was brief and immaterial to the main question before the jury: whether defendant was the individual who fled from police on October 11, 2013. Moreover, the court subsequently instructed the jury that the attorneys' arguments are not evidence and that the case should be decided based solely on the evidence admitted. We must presume that the jurors followed this instruction. *Graves*, 458 Mich at 486.

Defendant further challenges the prosecutor's comment in rebuttal argument that Fountain "probably has the greatest testimony of all, and she wants you to believe she bought this gun. You know, she bought this gun for her fianc[é], [defendant], because he can't buy his own gun because he's a felon." Fountain denied during cross-examination by the prosecutor that she purchased the handgun for defendant. However, the prosecutor's statement was a reasonable inference arising from the facts presented at trial. Fountain testified that she knew her fiancé could not possess or be around firearms and yet she claimed to have purchased a gun in secret and kept it at her sister's home. Fountain gave conflicting testimony about taking classes toward becoming eligible to carry a concealed weapon, and still had not applied for her license by the time of trial. Moreover, Fountain testified that she kept the clip and handgun in separate compartments of her vehicle, and yet, when defendant took flight and dropped the weapon, it was in one piece and loaded. Given defendant's possession of the handgun under such suspicious circumstances, the prosecutor reasonably inferred that the weapon was purchased for him.

Defendant also asserts that the prosecutor improperly denigrated counsel during closing arguments by stating:

> [Defense counsel] is going to have a chance to speak with you in a moment. I have great respect for [defense counsel]. He has a job to do in this case. When you don't have a defense, your defense turns to the one thing you have left. Well, the police must be lying. If the police aren't lying, they got the wrong guy.

> * * *

> Ladies and gentleman, defense counsel wants to focus again on the fingerprints. You heard more likely than not a usable print is not on a gun. If I were to touch it, no smudging, no putting it in my pocket, my prints aren't going to be there. Defense counsel wants to focus on that because when you don't have a defense, you've got to point to things that really aren't issues.

"[T]he prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury" or denigrate defense counsel. *People v Fyda*, 288 Mich App 446, 461; 793 NW2d 712 (2010). A prosecutor is permitted, however, to address the weaknesses of a defendant's theory of the case. *Id.* at 462. That is all the prosecutor did here. Defendant's theory was that this was a case of mistaken identity. It revolved around attacking the police

-10-

officers' credibility, which counsel supported by the lack of fingerprint evidence on the gun. The prosecutor's comments did not suggest that defense counsel intentionally attempted to mislead the jury; rather, the argument discredited defendant's theory that the officers could not have properly identified defendant as the perpetrator because his fingerprints were not found on the gun. Thus, the prosecutor's comments do not amount to misconduct.[5]

We affirm.


/s/ Amy Ronayne Krause
/s/ Elizabeth L. Gleicher
/s/ Cynthia Diane Stephens

---

[5] Defendant challenges defense counsel's failure to raise contemporaneous objections to the prosecutor's comments. This Court has held that declining to raise objections during closing arguments is consistent with sound trial strategy. *Unger*, 278 Mich App at 242. And none of the comments merit relief in any event.